Good morning, Your Honors. John Stobart for Appellant Cynthia Painter. Cynthia Painter is a California consumer who was in the market for a product that resembled and substituted for milk and had the same nutritional content as milk. She's shopping at a Costco and she sees Appellee's Blue Diamond Growers almond milk product. She instantly recalls advertisements where Blue Diamond says that their product is a quote, deliciously creamy alternative, end quote, to milk. She also recalls advertisements saying that it is a quote, top plant source of protein, end quote. So she decides to try the product and she purchases it. Lo and behold, the almond milk does not have the same nutritional content. Although it resembles milk and it substitutes milk in that she can put it in her coffee, pour it over her milk, or drink it in a glass, it did not have the same amount of protein. In fact, it had, our dairy milk has eight times the amount of protein. So therefore, it's nutritionally inferior. Well, let me just ask, assuming that the reasonable consumer standard applies, what is your best argument that Blue Diamond's almond milk products would mislead a reasonable consumer into thinking that almond milk is as nutritious as dairy milk? I would love to address that question, Your Honor. Thank you. I think the best evidence we have here comes from both the legislative and the executive branch. There's 25 members of Congress, according to the L.A. Times, that have put forth a Dairy Pride Act, and the Dairy Pride Act was introduced. The what act? The Dairy Pride Act, introduced January 12, 2017, 115th Congress, this congressional session. Is that in your brief? It is. All right. And the Dairy Pride Act says that imitation dairy products, such as plant-based products derived from rice, nuts, et cetera, and other foods that imitate milk, yogurt, and cheese, often do not provide the same nutritional content. Therefore, in this act, it says plant-based products labeled as milk are misleading to customers. Now, we have that. We also have the FDA, and may I seek permission to speak about the request for judicial notices that were submitted? We submitted two of them. Two of them handled press releases from the FDA, and another document we wanted judicial notice of was a Code of Federal Regulations, where the FDA has opened it up to public comment. I don't think we've ruled on that, but you may discuss them. Thank you. So we also have the FDA, who is currently investigating this, and when the FDA first came out, this was after the briefs were submitted. This is July 26, 2018. The FDA said that plant-based foods that are being positioned in the marketplace as substitutes for standardized dairy were of concern, and one of the reasons was, quote, case reports show that feeding rice-based beverages to young children resulted in a disease called Kashiwakor, a form of protein malnutrition. Now, the FDA then came out, and this was in September 27 of 2018, and specifically said, quote, the FDA has concerns that the labeling of some plant-based products may lead consumers to believe that those products have the same key nutritional attributes as dairy products. And the FDA also goes on to say, quote, these plant-based products may not be satisfactory substitutes for all uses of dairy. But you're not contending that there's anything about the labeling here that's misleading? No, we're not. And all the nutrient values are correctly labeled on the almond milk packaging? On the back of the packaging? Yeah, on the packaging. Correct. And I misspoke. There is one thing about the labeling, and that's calling it milk. Now, this is not a standard of identity case. Under 403 of the Food, Drug, and Cosmetic Act, there's several different ways a product can be misbranded. One is by using a standardized term like milk. Under those cases, if the food does not fit the definition, it's misbranded. We are not bringing one of those cases. We are bringing an imitation case. Now, the imitation case differs because you can use the term, the standardized term, but it has to have the word imitation before it. But it doesn't purport to be imitation milk. It presents itself as almond milk. Well, that's correct, but it also substitutes and resembles for. So when in the Code of Federal Regulation 101.3E1, they give us some guidance on what makes it an imitation. And there's three different requirements. One, it's got to resemble. Two, it's got to substitute for. And three, it has to be nutritionally inferior. Was there any evidence in the record about consumer being mistaken? Well, Ms. Painter said that she was mistaken. That is the evidence. And she was misled. Correct. That's your only evidence. That's the only allegation. Correct. The only allegation, yes. She was misled and that consumers like her are also misled. This is at the dismissal stage. So we're just dealing with the complaint, right? Yes, we're dealing with the complaint and we're seeing whether it's possible that somebody could be misled. I think the fact that the FDA is investigating it, I mean some of the questions the FDA are investigating go to the core of the ultimate merits questions in this case. And my second request for judicial notice, this is in the Federal Register and it was published September 28, 2018. And the questions they want to know is, how many different types of plant-based products that are manufactured to resemble dairy products, for example, milk, are out there? They also ask the question, what percentage of each subclass, soy or almond plant-based products, is marketed as a substitute for their dairy counterpoint? So the issue of whether these resemble in substitute for milk are the top two questions that the FDA has opened up for public comment. These are questions that cannot be resolved at the district court level where in this court set in Gerber, Williams v. Gerber, and that's the case that established the reasonable consumer standard. I remember Judge Pegerson. So the district court there, solely relying on the packaging, found that it was dismissed the case because the fruit juice snacks, no reasonable consumer would mistake a fruit juice snack for actually having fruit juice, which it did not have. Now, this court said, quote, it's a rare situation which granting a motion to dismiss is appropriate, end quote. And a good example of when it was appropriate is there's the case of Warblex v. PepsiCo, and this was cited by the Ang case, which the district court relied on. And in that case, we had Captain Crunch with Crunch Berries. And the consumer sued and said, I got Captain Crunch with Crunch Berries. It's a cereal, but there were no berries in it. And the district court there said, well, of course there weren't. They're Crunch Berries. This is a cereal. No reasonable consumer would think that there were berries in this. So I keep coming back to how do you distinguish this case from cases like the non-dairy creamer case where it's a sui generis type product and it's not imitation cream? Courts have held that if you say non-dairy creamer, then that product is not imitation cream. I mean, this is saying almond milk. Wouldn't the reasonable consumer say, oh, that's milk from almonds? Well, I would distinguish that on two different grounds, the first one being those cases were brought under the standard of identity, subsection G, which says using the actual terms. This case is brought as an imitation. So given that the reasonable consumer would apply in both of those, here we have direct evidence saying that consumers are being misled. And we also have direct evidence. No, we're not talking about evidence, and I think that's... That was my fault. No, it wasn't, because it's the way they're talking about it in their briefs, too. We're not talking about evidence here. We're talking about allegations, right? So you have to show a plausible claim that consumers would be confused or a reasonable consumer would be misled. Well, instead of classifying as evidence, there's concerns. I mean, this is a matter of public debate right now. It has not been resolved by the FDA or by Congress as to whether or not consumers are misled. Right, but we have to decide this case, whether it was correctly dismissed or not. And we have to decide whether it's plausible. And if it was implausible that nobody be misled, the FDA wouldn't be conducting an investigation. It would be a waste of time. And there wouldn't be the Dairy Pride Act sitting before Congress right now because that would be a waste of time. Mr. Stobart, wasn't this Iqbal-Tuamli standard that Judge Wilson was applying? I'm sorry? Wasn't Judge Wilson applying the Iqbal-Tuamli standard under 12b-6 analysis? Is that what he was doing here? Yes, and what he said is... And didn't Justice Kennedy tell we district judges that we were supposed to draw on our common sense and judicial experience? And he drew on his common sense and judicial experience, and he said no reasonable consumer could confuse a product of almonds and a product of dairy milk. That was the way I got his ruling. What did I miss? That was his ruling. And when doing that, what you just described there is an instance of a standard of identity. We're not saying that anybody is purchasing almond milk thinking it comes from a cow. That would be a violation of the standard of identity. What we're saying is people are purchasing almond milk thinking that it has the same nutritional contents of almond milk, and it doesn't. Now, if it said imitation milk on the carton, it would not only be in compliance with the FDCA, but it would also give the consumer a chance to know that, hey, this is an imitation. Wouldn't that be false? Because it is an authentic product of almonds. So if you said imitation milk, that wouldn't be true. But this is a congressional standard here where they say if it resembles and it substitutes for and is nutritionally inferior, it falls within the FDCA imitation provisions, and it has to say, by law, it has to say that it's an imitation of the standardized food. Well, Judge Pratt asked the question I should have asked and meant to ask. What is your answer to his question, that the district court judge made that decision? Correct. Well, first of all, I would say that this is not one of the rare – it's too close of a call. It's not so one-sided as to Crunch Berries, the difference here. But secondly, when he was using the standard of identity framework, I would agree. I don't think anybody seeing almond milk would think that it's a cow's milk. But I think it's a much more subtle question as to whether or not when you see its milk, is it going to have the same amount of protein? Is it going to have the same amount of vitamins? And if it doesn't, then it falls within the imitation provision of the FDCA. And at that point, if it doesn't say imitation, it's misbranded. So is soy milk misbranded as well? I would have to look at the nutritional contents. It's been held by courts that soy milk is not misbranded. So then if the nutritional contents are the same, then it would not fall within 403E. I'm sorry, 403C. It would not. But here, it has eight times the amount less of protein as regular milk. It is not nutritionally equivalent. So therefore, when it substitutes and resembles, which are two questions, like I said, that have not been resolved by anybody except this district court, when it substitutes and resembles milk, and it's nutritionally inferior, they have to put the imitation label on there. Now, it doesn't have to be called almond milk, almond imitation milk, but somewhere in the packaging in the same size, it has to indicate that it's an imitation. If I could save these last two minutes. Yes, you may. Thank you, Your Honor. Good morning, Your Honors. May it please the court, my name is Adam Hoffman, and I'm here today on behalf of Appellee Blue Diamond Growers. Your Honors, the imitation labeling requirement set out in 21 CFR Section 101.3E cannot be construed in a way that plausibly requires almond milk to be labeled imitation milk. Now, before I get to the reasons why, I think it's worth emphasizing, as some of the discussion just now reflected, that Ms. Painter's appeal poses that question, the correct application of the imitation labeling requirement. I highlight that because so much of the discussion post-briefing in the request for judicial notice highlights signals from the FDA that it is considering whether the use of the term milk in the product named almond milk leads to consumer confusion. That's an issue that it is apparently studying, but that's not what this appeal is about. Well, let me just ask, what is the definition of imitation food that the panel should use in this case, and where does this definition come from? Thank you, Your Honor. So the definition comes from Section 101.3E, 21 CFR 101.3E, and it describes imitation products as those that substitute for and resemble a standard food and which are nutritionally inferior. Well, 103E says that food is an imitation only if it substitutes and resembles another food and if it is nutritionally inferior to that food. Yes, Your Honor. And your response is? Yes, so I think from Blue Diamond's perspective, the issue that's teed up by this Court is exactly how to apply that definition in the context of almond milk. And so Blue Diamond's view of it is there's a couple of different options we've outlined in our briefs, but the most workable and clearly supported approach is to apply the regulation to foods that begin with a traditional food and then reduce a natural or traditional ingredient or component of that food and to replace it with a cheaper, less nutritious alternative in order to increase yield or shelf life. So again, the primary touchstone would be starting with a traditional food, reducing some content, and replacing it with a nutritionally inferior substitute. We think that's reflected in the regulatory text as well in the case law that supported the adoption of that regulation. You have the imitation jam case and the Chilsert imitation ice cream case that the FDA specifically identified when it was adopting Section 101.3E. At the same time, the FDA contrasted what it viewed as imitation foods, imitation jam, imitation ice cream, from what it described as separate and distinct products, which it found were not imitation foods in light of existing case law at the time. And I think those are critical examples because each one of those was a food that started out like almond milk, as a plant-based food, but then was manufactured to resemble, taste like, and be used in place of a cream product, but which the case law held was not imitation cream, and the FDA agreed and approved that definition. And indeed, in Volume 38 of the Federal Register, at page 20702, it says, The Commissioner concludes that the definition of imitation set forth in this regulation is fully consistent with the Court's opinion in the jam and Chilsert case. So again, those are traditional products that have been reduced in some way. And I think that construction of the rule is then further bolstered by the regulatory definition of nutritional inferiority. 21 CFR Section 1013E4, little i, defines nutritional inferiority, quote, as any reduction in the content of an essential nutrient that is present in a measurable amount. The use of the word reduction reflects a change to an existing thing, not a comparison between two distinct things. It does not say less than in comparison with something else. It says a reduction to, or excuse me, a reduction in. And the reduction is something that is, quote, present in a measurable amount. Again, that suggests the existence of a product that is diminished in some way, not a comparison between two separate products. So Blue Diamond's view is that this construction both establishes a clear, workable definition, as the FDA intended, that manufacturers can use to determine in advance whether their products fall within the imitation labeling requirement or not. It also reconciles the regulation's text, the regulatory history, the case law that predated it. And that is, to answer Your Honor's question, that is the definition that we think should apply. Now, Mr. Hoffman, does your company concede the first two parts of what are required here? Do you concede substitution and resemblance? We do not, as those terms are used in the regulation, Your Honor. Okay. Certainly, it would be hard to argue that almond milk is a white liquid and is used over breakfast cereal sometimes. In that sense, there is a resemblance, but resemblance alone is not sufficient. Well, I was struck by the amicus brief. Here's what the amicus says. The primacy of these elements, talking about substitution and resemblance, over the third paren, nutritional inferiority, is confirmed by the regulatory history. Here's the intro to the CFR. Nutritional inferiority is not the only criteria involved in defining imitation status. An evaluation of the overall impression conveyed by the food must first establish that the food is a substitute for and resembles another food. Here's what I got from Judge Wilson's ruling. No reasonable consumer could think that it either resembles or substitutes for dairy milk. Is that what you got from the ruling? Yes, Your Honor. Okay. And I agree wholeheartedly. Okay. And so we would leave room for the possibility of something. I think that the construction of the regulation that we've articulated makes that absolutely clear as a matter of law. It provides a clear delineation. But to Your Honor's question, even if you were to go down the road of allowing for a more expansive definition of imitation under Section 101.3, there is still a necessary touchstone of the consumer expectations. There is no reasonable consumer expectation that is violated by almond milk not being called imitation milk. And I think that is exactly what Judge Wilson determined and correctly so. Forgive me, Your Honor. I lost my train of thought. I think it's perhaps there's a couple cases that I wanted to discuss in connection with that. The first is Ms. Painter's reliance on the Williams case. And counsel described that case aptly. That was a case in which you had a label that described a product that was basically candy as fruit juice snacks. And then it peppered the label with images of fruit that were not present at all in the product. Contrast that with almond milk, which clearly, even as alleged, identifies itself as an almond product. The labeling, again, as alleged, describes itself as lactose-free, soy-free, and an alternative to dairy milk. There's no indication, there's no suggestion of dairy content or of nutritional equivalent. I don't know. You're not at the evidentiary stage. But my understanding of why people turn to soy milk or almond milk or whatever is that they can't tolerate dairy products. And so they know they're looking for something that's not dairy. Yes, Your Honor, I agree. And so I guess reasoning from that, I would think that, I guess I'm applying my own common sense like Judge Wilson, I would think that if you're using these as alternatives to dairy, you know you're not getting necessarily the same nutrients or ingredients because that you can't tolerate the form of the dairy, so you have your allergic reaction to it or it doesn't go well with you. I mean, that's the way I understand how these alternative milk products have arisen. Yes, Your Honor, that's my understanding as well. And applying Iqbal and Twanley, I think that's a perfectly appropriate consideration that the district judge applied here to dismiss the case. So I agree completely. The last point I would raise then is just to contrast Williams with this court's decisions, especially in Ebner v. Fresh, Inc., which found that under the reasonable consumer expectation test, people understand that there's a small amount of lip gloss left in the tube when the product has been used up. That then qualified for dismissal. It was one of the cases where it was so implausible, the claim was so implausible, it was appropriate to dismiss. Your Honors, the briefs touch on primary jurisdiction. I think we've covered that well in the briefing, but I'm happy to answer any questions about that. Your position is that the FDA does not have primary jurisdiction over this case? Well, not over this case, Your Honor. Certainly Blue Diamond raised the primary jurisdiction doctrine as a basis for dismissal in the district court. That was resisted by Ms. Painter successfully. The court did not go that route. And so we would say that the issue is either waived or that Ms. Painter has stopped from asserting it now. But I would also highlight the fact that the concern that primary jurisdiction is meant to address is allowing the regulatory agency an opportunity to regulate when it wishes to do so. Certainly dismissing Ms. Painter's case and affirming on that grounds serves the same end. So we don't think it applies here at this stage. Though certainly at the motion to dismiss stage, it was an issue that we raised. It seemed to me that judicial estoppel would apply because at the district court you argued that primary jurisdiction doctrine did not apply. But then the district court decided the case on the merits. Doesn't judicial estoppel then prevent you from now requesting that we invoke primary jurisdiction? Yes, Your Honor. It was Ms. Painter who now asked for the invocation of primary jurisdiction, and we agree it is too late. And we've cited some cases for that proposition that if it's not timely asserted, it's waived. And indeed, to the contrary here, it was affirmatively opposed by Ms. Painter. So, yes, we agree. Unless the court has other questions, I'm happy to submit. Thank you, Your Honors. Thank you, Counsel. First, I think it's a little bit disingenuous to say that Blue Diamond doesn't believe their product substitutes for and resembles when their advertising holds their product out as a, quote, creamy alternative, end quote, to milk. I mean, creamy, it's an adjective derived from the word cream. It's saying that it resembles. Creamy means it resembles. Alternative means it substitutes. So they're definitely playing on that resemblance and substitutes to a certain level. To the extent, Judge Wardlaw, that you asked about people who are lactose intolerant, the first-minute complaint talks about how much this has increased. The increased interest in this product has far elapsed the amount of lactose intolerant people in the country. So although lactose intolerant people would go after this beverage, people who do enjoy dairy and can enjoy dairy are also purchasing it. Like Ms. Painter. She drank milk for years, and then she switched to this, hoping to get the same nutritional content. Mr. Stobart, let me ask you just, I see this from, of course, the district court standpoint, but if we were under the now-retired Connolly v. Gibson no set of facts, you could get discovery. Is it your claim here that the hurry-up-and-move cases that Twombly, Iqbal, et cetera, et cetera, have deprived you of establishing the kind of factual record that could help us with those three elements, resemblance, substitution, and nutritional inferiority? Absolutely, and I think that the FDA's pending investigation might help us out as well. Did you tell the district court, don't blow me, don't throw it out now, I can produce evidence that show the consumer was misled? Well, that was our argument, yes. But it was, yes, that after we fully develop these factual issues, that we'll be able to establish with evidence whether or not consumers are misled, what they use the product for, what they think of when they're using the product, and what they expect to get out of the product. Okay. Thank you, Your Honor. Thank you, counsel. Painter v. Blue Diamond will be submitted.
judges: D.W. Nelson, Wardlaw, Pratt